# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION



| | |
|---|---|
| UNITED STATES OF AMERICA | 3:18-cr-00319-JO |
| v. | **SUPERSEDING INDICTMENT** |
| **MARK LEROY DENCKLAU,** | 18 U.S.C. § 1962(d) |
| **EARL DEVERLE FISHER,** | 18 U.S.C. §§ 1959(a)(1) and 2 |
| **KENNETH EARL HAUSE,** | 18 U.S.C. §§ 1201(a)(1) and 2 |
| **RYAN ANTHONY NEGRINELLI,** | 18 U.S.C. §§ 1201(a)(1) and 1201(c) |
| ██████████████ and | |
| **JOSEPH DUANE FOLKERTS,** | **Forfeiture Allegation** |
| Defendants. | ***UNDER SEAL*** |

## THE GRAND JURY CHARGES:

Background

At all times relevant to this Superseding Indictment:

1.     There existed in the District of Oregon, and elsewhere, a criminal organization, namely, the "Gypsy Joker Outlaw Motorcycle Club," which constituted an enterprise, as defined by Title 18, United States Code, Sections 1961(4) and 1959(b)(2), that is, a group of individuals associated in fact, which was engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

2.     The Gypsy Joker Outlaw Motorcycle Club [hereinafter referred to as "GJOMC"] was an "outlaw" motorcycle organization comprised of individual chapters located in cities throughout Oregon and Washington, including Klamath Falls, Portland, Salem, Seattle, Spokane, and the Tri-Cities (Kennewick).

3.     Each chapter had officers, to include a president, vice-president, treasurer, sergeant at arms, and other general members. The chapters ultimately fell under the authority of the national president, also known as "the Wiz." Criminal activities of the GJOMC and their support clubs were often committed at the direction of the national and chapter officers. Associates and members followed a written code of conduct which identified the GJOMC as a "1%," or outlaw motorcycle club. Violations of the code resulted in fines, probation, expulsion, a new prospecting period, or acts of violence against the violator.

4.     Membership in the GJOMC was available only to men over the age of 21. The GJOMC excluded African Americans, law enforcement officers, homosexuals, and intravenous drug users from membership. Members were required to own an American made motorcycle.

5.     Full membership in the GJOMC is also known as "patched" status. Members of the GJOMC are "patched" as a formal method of identifying themselves and their level of participation in the GJOMC. "Patched" status is a reference to the GJOMC three-piece logo patch that only GJOMC members were permitted to wear.

6.     The vestments denoting membership in the GJOMC, referred to as "cuts" or "colors," included a leather vest with a patch depicting the club emblem, a court jester known as "Simon." The "Simon" emblem was surrounded by patches called a top "rocker" bearing the words GYPSY JOKER and a bottom "rocker" identifying the nationality of the member (U.S.A., Germany, or Australia). The vests also displayed other symbols including a "1%er" in a

diamond, a 5-year member patch, and "In Memory" patches to recognize deceased members. The "1%" designation is in response to a proclamation issued in the 1940s by the American Motorcycle Association that ninety-nine percent of persons in motorcycle clubs were law-abiding citizens. The "1%er" patch signifies that the GJOMC members were in the other 1%; that is, they were not law-abiding citizens.

7.      Gaining membership in the GJOMC involved a specific process. It started with participation in the GJOMC as an associate or "hang around," and was followed by a prospecting period before full membership was granted. During this period, prospective members, known as "prospects," were expected to assist the GJOMC with all of its activities, including those activities that were criminal in nature. GJOMC prospects were required to wear vests displaying patches denoting their prospect status. In order for a prospect to become a member, he was required to prospect for a minimum of six months; to attend a meeting in each chapter with his sponsor; and to have 100% support from his GJOMC chapter membership. The GJOMC determined whether a six-month prospecting term was sufficient for each prospect or whether to extend the prospecting period. At the end of the prospecting period, the GJOMC held a vote of patched members to determine whether to give patched, full member status to the prospect.

8.      GJOMC members paid dues to their local chapter, a percentage of which went to the national organization. Members who earned money from criminal activity were expected to contribute some of those earnings to the GJOMC.

9.      The GJOMC oversaw several "support clubs" in Oregon and Washington, including the Road Brothers Northwest Motorcycle Club, Solutions Motorcycle Club, Northwest Veterans Motorcycle Club, High-Side Riders, and the Freedom Fellowship Motorcycle Club. Support club members all paid monetary dues to their own clubs, a percentage of which went to

the GJOMC. Support club members conducted criminal activities in support of, and in association with, the GJOMC and served as a source for new membership. Support club members were permitted to wear a patch on their vests to advertise their allegiance to the GJOMC, including patches that read "Simon Sez."

10. The GJOMC owned real and personal property, and conducted regular meetings of its officers and general members. The GJOMC often decided various issues by voting. Members attended weekly meetings called "church" at their chapter clubhouses. Members also participated in several "required" motorcycle runs every year, including New Years, Simon's Birthday (April 1), Memorial Day, July 4 Summer Run, and Labor Day. These runs often started in one state and ended in another. Activities of the GJOMC frequently required interstate travel.

11. Members and associates of the GJOMC would commit, and threaten to commit, acts of violence to maintain membership and discipline within the GJOMC and to intimidate rivals or non-members. Participation in criminal activity by a member or associate increased the respect accorded to that member or associate, and resulted in that member or associate maintaining or increasing his status and position within the enterprise. Likewise, a member's or associate's refusal to carry out orders from higher-ranking members, or refusal to participate in criminal activity or acts of violence, decreased the respect accorded to that member or associate, and resulted in decreasing that member's or associate's status in the GJOMC and subjected the member or associate to acts or threatened acts of violence.

<u>Purposes of the Enterprise</u>

12. The purposes of the enterprise included the following:

a.   Preserving, promoting, and protecting the power, territory, and profits of the enterprise through the use of intimidation, violence, threats of violence, assaults, witness tampering and retaliation, kidnapping, and murder;

b.   Enriching the members and associates of the enterprise through, among other things, extortion, robbery, and distribution of narcotics;

c.   Promoting and enhancing the enterprise, and the reputation of the enterprise, through its members' and associates' activities, including, but not limited to, robberies, extortion, drug distribution, stealing motorcycles and trafficking in stolen motorcycles, and other criminal activities;

d.   Keeping victims, potential victims, potential witnesses, and community members in fear of the enterprise and in fear of its members and associates through threats of violence and violence;

e.   Extorting others through fear and threats of violence; and

f.   Providing assistance to other members and associates who committed crimes for and on behalf of the enterprise; and providing assistance to other enterprise members and associates, in order to hinder, obstruct, and prevent law enforcement officers from identifying the offender, apprehending the offender, and trying to punish the offender.

<u>Manner and Means of the Enterprise</u>

13.   The manner and means used by the enterprise to further the goals of the enterprise and achieve its purposes included, but was not limited to, the following:

a.   Members of the enterprise and their associates were expected to learn and abide by the rules and code of conduct of the enterprise, including wearing required articles of clothing, and discipline would be meted out to members who broke these rules;

b.     Members of the enterprise and their associates used, attempted to use, and conspired to use extortion, the proceeds of which were used to benefit the enterprise and its members;

c.     Members and associates of the enterprise committed, attempted, conspired, and threatened to commit acts of violence, including murder, assaults, robbery, and extortion, to protect and expand the enterprise's criminal operations;

d.     Members and associates of the enterprise promoted a climate of fear through intimidation, violence, and threats of violence;

e.     Members and associates of the enterprise trafficked in methamphetamine and marijuana to enrich the enterprise and its members; and

f.     Members and associates of the enterprise extorted other motorcycle organizations to pay money to the GJOMC, upon fear and threats of violence.

## COUNT 1
### (Racketeering Conspiracy)
### (18 U.S.C. § 1962(d))

14.     Beginning on a date unknown, but starting no later than the year 2003, and continuing to on or about the date of this Superseding Indictment, in the District of Oregon and elsewhere, the defendants

MARK LEROY DENCKLAU,
EARL DEVERLE FISHER,
KENNETH EARL HAUSE,
RYAN ANTHONY NEGRINELLI,
██████████████
and
JOSEPH DUANE FOLKERTS,

and other persons not named in this Superseding Indictment, being persons employed by and associated with the GJOMC, which enterprise is described more fully in paragraphs 1-13, which

was engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly, willfully and unlawfully combine, conspire, confederate, and agree with one another to violate Title 18, United States Code, Section 1962(c); that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of said enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Section 1961(1) and (5), consisting of:

a. Multiple threats and acts involving:

(1) Murder, in violation of Oregon Revised Statutes, Sections 161.450, 161.155, 161.405, and 163.115, and Revised Code of Washington, Sections 9A.28.040 9A.08.020, 9A.28.020, and 9A.32.030;

(2) Kidnapping, in violation of Oregon Revised Statutes, Sections 161.450, 161.155, 161.405, 163.235, and 163.225; and Revised Code of Washington, Sections 9A.28.040, 9A.08.020, 9A.28.020, 9A.40.020, and 9A.40.030;

(3) Robbery, in violation of Oregon Revised Statutes, Sections 161.450, 161.155, 161.405, 164.415, and 164.405; and Revised Code of Washington, Sections 9A.28.040, 9A.08.020, 9A.56.200, and 9A.56.210; and

(4) Extortion, in violation of Oregon Revised Statutes, Sections 161.450, 161.155, 161.405, and 164.075;

b. Multiple offenses involving:

(1) Drug trafficking, in violation of Title 21, United States Code, Sections 841 and 846; and

c. Multiple acts indictable under the following provisions of federal law:

(1) Title 18, United States Code, Section 1512 (tampering with a witness, victim, or informant).

## Overt Acts

In furtherance of the conspiracy, and to affect the object and purposes thereof, defendants MARK LEROY DENCKLAU, EARL DEVERLE FISHER, KENNETH EARL HAUSE, RYAN ANTHONY NEGRINELLI, ███████████████ JOSEPH DUANE FOLKERTS and others known and unknown, committed various overt acts, including, but not limited to, the following:

15.     On or about August 11, 2003, GJOMC members and an associate drove to Victim 1's residence in Linn County, Oregon and a GJOMC member hit Victim 1 over the head with a large crescent wrench, causing injury and bleeding, and the other GJOMC members and associate assaulted Victim 1 and took Victim 1's vehicle from him.

16.     On or about September 25, 2008, defendant KENNETH EARL HAUSE summoned an Oregon Veterans Motorcycle Association (OVMA) member to a meeting at the clubhouse of the Northwest Veterans Motorcycle Club (NWVMC), which is a GJOMC support club.

17.     On or about September 25, 2008, defendant KENNETH EARL HAUSE wore large rings or brass knuckles when he punched an OVMA member, resulting in the OVMA member losing teeth and having to go to the hospital to seek medical attention. HAUSE told the OVMA member after assaulting him that he had, "30 days to shut [OVMA] down," and that OVMA members were no longer permitted to wear their patches.

18.     On or about September 25, 2008, when defendant KENNETH EARL HAUSE assaulted an OVMA member, another GJOMC member assaulted another OVMA member.

19.    On or about September 25, 2008, defendant KENNETH EARL HAUSE told the OVMA members that if they told anyone about the assault, that HAUSE would kill them.

20.    On or about September 25, 2008, after the assault of the OVMA members, defendant KENNETH EARL HAUSE told two NWVMC members to not let the OVMA members leave the NWVMC clubhouse for at least fifteen minutes, which gave HAUSE and other GJOMC members time to leave and distance themselves from the NWVMC clubhouse.

21.    On or about December 27, 2008, defendant EARL DEVERLE FISHER, along with GJOMC members and associates, assaulted individuals at Bar 181 in Portland, Oregon after learning that one of the individuals had mentioned the GJOMC to the police.  GJOMC members and associates hit one person in the face and FISHER struck another person over the head with a sap weapon, causing the person to lose consciousness.

22.    In or around December of 2008, a GJOMC member distributed methamphetamine to a GJOMC associate.

23.    On or about January 5, 2009, a GJOMC member approached an OVMA member at The Spot bar in Mollala, Oregon, and proceeded to punch the OVMA member in the face, hit him in the back of the head, and kick him in the ribs because the OVMA did not follow defendant KENNETH EARL HAUSE's order to disband.

24.    In or around 2009, defendant KENNETH EARL HAUSE, along with another GJOMC member, possessed with the intent to distribute approximately 100 bricks of methamphetamine stored in milk crates in a trailer.

25.    In or around 2009, defendant KENNETH EARL HAUSE distributed methamphetamine to a GJOMC associate during a "poker run."

26. In or about April or May of 2009, a GJOMC member saw an OVMA member wearing his OVMA patch at an event in Salem, Oregon, and approached the OVMA member asking him to go outside. Once outside, the GJOMC member told him to "take off your patch," and the OVMA member refused to remove his patch at which time the GJOMC member and at least four additional GJOMC members or associates assaulted the OVMA member.

27. In or about April or May of 2009, GJOMC members followed OVMA members as they rode their motorcycles out of Salem, Oregon, after a GJOMC member assaulted an OVMA member.

28. In or around the summer of 2009, defendant KENNETH EARL HAUSE distributed methamphetamine to a GJOMC associate during the "summer run."

29. In or around the summer of 2009, defendant MARK LEROY DENCKLAU possessed cocaine, mushrooms, and ecstasy for distribution during the "summer run."

30. In or around mid-2009, a GJOMC member distributed methamphetamine to a GJOMC associate at the Dancin' Bare bar in Portland, Oregon, and crushed the methamphetamine on the front fender of a motorcycle to prepare the methamphetamine for ingestion.

31. In or around 2009, during Run 21 in Vernonia, Oregon, defendant MARK LEROY DENCKLAU, along with other GJOMC members and associates, instructed members of OVMA that they were not permitted to wear their OVMA patches and proceeded to cut two of the OVMA members' patches off their vests while two other OVMA members handed over their OVMA patches to the GJOMC members and associates. An additional OVMA member arrived wearing an OVMA patch, DENCKLAU punched the OVMA member, and other OVMA

members removed the fifth member's patch and handed it over to DENCKLAU who took it with him when he left.

32. On or about July 26, 2009 in Vernonia, Oregon, defendants KENNETH EARL HAUSE and MARK LEROY DENCKLAU, along with GJOMC members, told OVMA members to remove their patches, and DENCKLAU punched one of the OVMA members causing him to fall to the ground, at which time a GJOMC member pulled out a knife to remove the patch of an OVMA member, but was told by DENCKLAU to stop.

33. In or about 2010, defendant KENNETH EARL HAUSE paid a GJOMC associate $500 to assist HAUSE with a delivery of a large quantity of methamphetamine to the GJOMC Portland clubhouse and HAUSE told the GJOMC associate that if anything happened, HAUSE would take the blame.

34. In or about and between 2010 and 2012, defendant KENNETH EARL HAUSE delivered a baseball-sized ball of methamphetamine to another GJOMC member for redistribution.

35. On or between July 21 and August 12, 2011, a GJOMC member transported a stolen Harley Davidson Road King (1998) with an altered VIN number from Salem, Oregon to Sturgis, South Dakota.

36. In or about the summer of 2012, defendant MARK LEROY DENCKLAU ordered a GJOMC member to show up to the run they were on because defendant KENNETH EARL HAUSE wanted to talk to the GJOMC member.

37. In or about the summer of 2012, four GJOMC members went to another GJOMC member's location in Moscow, Idaho and ordered him to come with them because KENNETH EARL HAUSE wanted to see the GJOMC member.

38.     In or about the summer of 2012, on the orders of defendant KENNETH HAUSE, three GJOMC members transported another GJOMC member in a vehicle from Moscow, Idaho, to the GJOMC clubhouse in Lostine, Oregon, where they spent the night.

39.     In or about the summer of 2012, while at the GJOMC clubhouse in Lostine, Oregon, a GJOMC member punched another GJOMC member in the eye on the orders of KENNETH HAUSE.

40.     In or about the summer of 2012, after spending the night at the GJOMC Lostine clubhouse, two GJOMC members transported another GJOMC member to the Tri-Cities clubhouse in Kennewick, Washington on the orders of KENNETH EARL HAUSE, and stopped at a gas station along the way.  When they arrived, an additional GJOMC member and two GJOMC associates were present at the clubhouse.

41.     In or about the summer of 2012, defendant KENNETH EARL HAUSE assaulted a GJOMC member with a bag filled with heavy objects, knocking him unconscious at the GJOMC Tri-Cities clubhouse.

42.     In or about the summer of 2012, at the GJOMC Tri-Cities clubhouse, defendant KENNETH EARL HAUSE punched, kicked, and stomped a GJOMC member with HAUSE's heavy motorcycle boots knocking out several of the GJOMC member's teeth, while telling the GJOMC member, "you're no longer a member."

43.     In or about the summer of 2012, at the GJOMC Tri-Cities clubhouse, GJOMC members and associates punched and struck another GJOMC member, took the GJOMC member's cut, and tattooed a large "X" over the GJOMC patch tattoo the GJOMC member had across his back.

44. In or about the summer of 2012, a GJOMC member bragged to a GJOMC associate that the GJOMC member had participated in tattooing over another GJOMC member's GJOMC patch tattoo and that during the tattooing had dug deep into the other GJOMC member's skin.

45. In or about the summer of 2012, after the assault of the GJOMC member, at least six of the teeth knocked out of the GJOMC member's mouth were placed onto the bar at the GJOMC Tri-Cities clubhouse.

46. In or about the summer of 2012, after the assault and tattooing of a GJOMC member, another GJOMC member told the GJOMC member that had been assaulted and tattooed that, "Ken will kill you if you don't give up your motorcycle."

47. In or about the summer of 2012, after being told that defendant KENNETH EARL HAUSE would kill him if he didn't give up his motorcycle, the GJOMC member who had been assaulted and tattooed told another GJOMC member that he was at a bar and that he had his motorcycle at the bar. Defendant EARL DEVERLE FISHER and another GJOMC member came to that location and took the motorcycle.

48. In or about the summer of 2012, sometime after defendants EARL DEVERLE FISHER and a GJOMC member took another GJOMC member's motorcycle, an additional GJOMC member confronted the GJOMC member whose motorcycle had been taken at Jody's bar in Portland, Oregon, and told the GJOMC member his other motorcycle was being taken as well.

49. In or about July of 2012, three GJOMC members ordered another GJOMC member to assault a female associate because the three GJOMC members thought she was disrespecting the GJOMC by dancing with members of the Mongols Motorcycle Club.

50.     On or about November 4, 2012, GJOMC members assaulted GJOMC associate Jackie Ford in the street outside the Seattle GJOMC clubhouse by slamming her head into the curb, resulting in her losing consciousness, not having a pulse, and having to be brought back to life by police who responded to a 911 call reporting the assault and performed CPR.

51.     In or around November or December of 2012, defendant KENNETH EARL HAUSE and a GJOMC member went to another GJOMC member's home and KENNETH EARL HAUSE told the GJOMC member that they were taking his GJOMC cut for safekeeping while he was serving a prison sentence.

52.     On or about December 7, 2012, two GJOMC members who were armed with firearms went to another GJOMC member's residence to locate the GJOMC member.

53.     On or about December 7, 2012, two GJOMC members shot their firearms at another GJOMC member who returned fire with a firearm.

54.     In or around December of 2012, defendant KENNETH EARL HAUSE's GJOMC prospect and others forced a GJOMC associate out of the GJOMC associate's home by the GJOMC member pushing the GJOMC associate down the stairs and locking the GJOMC associate outside in the snow, without any shoes.

55.     In or around December of 2012, in the days after defendant KENNETH EARL HAUSE's GJOMC prospect and others forced a GJOMC associate out of the GJOMC associate's home, the GJOMC associate discovered that a motorcycle and other belongings were missing from the GJOMC associate's home.

56.     In or around December of 2012, defendant KENNETH EARL HAUSE told a GJOMC associate that he would see what he could do about returning the GJOMC associate's motorcycle, but HAUSE never returned the motorcycle to the GJOMC associate.

57.   During 2014 and 2015, defendants MARK LEROY DENCKLAU and EARL DEVERLE FISHER grew marijuana plants and sold the plants each month to the son of a GJOMC member.  DENCKLAU was paid $3,000 each month for providing marijuana plants.

58.   On or about June 2, 2014, two GJOMC members rode in a vehicle driven by a GJOMC associate to the location of Robert Huggins for the purpose of bringing Huggins to the GJOMC Portland clubhouse.

59.   On or about June 2, 2014, after driving to Robert Huggins' location, the GJOMC members told Robert Huggins he needed to come with them, and that "Boss says come now."

60.   On or about June 2, 2014, a GJOMC associate drove a vehicle to the GJOMC Portland clubhouse while two GJOMC members sat in the back seat of the vehicle on both sides of Robert Huggins, preventing Huggins from exiting the vehicle.  The GJOMC associate drove the vehicle to the GJOMC clubhouse in Portland, Oregon, and dropped off the two GJOMC members and Robert Huggins at which time the two GJOMC members physically held the arms of Robert Huggins, preventing him from escaping, and escorted Huggins inside the Portland GJOMC clubhouse.

61.   On or about June 2, 2014, a GJOMC member called a GJOMC associate and ordered the GJOMC associate to come to the GJOMC clubhouse in Portland, Oregon.

62.   On or about June 2, 2014, when the GJOMC associate arrived at the GJOMC clubhouse in Portland, Oregon, defendant MARK LEROY DENCKLAU told the GJOMC associate that they were going to take a ride, so the GJOMC associate got in a vehicle with DENCKLAU who told the GJOMC associate that the GJOMC associate was going to have to choose – the club or Robert Huggins.

63.     On or about June 2, 2014, after the GJOMC associate told DENCKLAU that the GJOMC associate chose Robert Huggins and not the club, a GJOMC member informed the GJOMC associate that they were keeping the Dodge Durango that the GJOMC associate had driven to the GJOMC clubhouse. The GJOMC associate perceived this as a demand, and handed over the keys because the GJOMC associate feared suffering physical violence.

64.     On or about June 2, 2014, a GJOMC associate received panicked messages from Robert Huggins who told her he needed $5,000 to pay the GJOMC. When the GJOMC associate arrived at the GJOMC clubhouse in Portland, Oregon, defendant MARK LEROY DENCKLAU told the GJOMC associate that they were going to take a ride together, so the GJOMC associate got in a vehicle with DENCKLAU who told the GJOMC associate that the GJOMC associate was going to have to choose – the club or Robert Huggins.

65.     On or about June 2, 2014, after the GJOMC associate told defendant MARK LEROY DENCKLAU that the GJOMC associate chose Robert Huggins and not the club, DENCKLAU promised the GJOMC associate that for $3,500, Huggins would not be hurt further.

66.     On or about June 2, 2014, three GJOMC members helped Robert Huggins into a GJOMC associate vehicle after Huggins had been badly beaten at the GJOMC clubhouse in Portland, Oregon.

67.



68.     In or around June of 2014, defendant EARL DEVERLE FISHER told a GJOMC associate that defendants MARK LEROY DENCKLAU, FISHER, and another GJOMC member assaulted Robert Huggins at the Portland GJOMC clubhouse resulting in serious injuries to Huggins.  FISHER explained that a GJOMC associate was told to come to the clubhouse to pick up Huggins because he was badly beaten.

69.     In or around June of 2014, defendant MARK LEROY DENCKLAU told a GJOMC associate that DENCKLAU kept Robert Huggins' motorcycle, and traded a separate motorcycle to the GJOMC in exchange.

70.     In or about July 2014, a GJOMC associate stole a "Dyna" motorcycle in Vancouver, Washington, but was told by a GJOMC member that he had to return the motorcycle because the motorcycle belonged to an associate of the GJOMC and was, therefore, protected.

71.     On or about October 25, 2014, a GJOMC member transported one pound of methamphetamine in his motorcycle saddle-bags to a mechanic shop connected to the RBMC clubhouse in Centralia, Washington and sold the methamphetamine for five or six thousand dollars.

72.     On or about June 18, 2015, defendant EARL DEVERLE FISHER told a GJOMC associate that the GJOMC was looking for Robert Huggins because Huggins had robbed the home and girlfriend of defendant MARK LEROY DENCKLAU, the president of the Portland chapter of the GJOMC.

73.     On or about June 30, 2015, a GJOMC associate located Robert Huggins at a residence in Portland, Oregon, and informed defendants MARK LEROY DENCKLAU and EARL DEVERLE FISHER and other GJOMC members and associates where Robert Huggins was located.

74. On or about June 30, 2015, defendants MARK LEROY DENCKLAU, EARL DEVERLE FISHER, RYAN ANTHONY NEGRINELLI, and other GJOMC members and associates, went to Robert Huggins' location and assaulted and kidnapped Robert Huggins from in front of a residence in Portland, Oregon. Defendant EARL DEVERLE FISHER and another GJOMC member were in a separate vehicle nearby.

75. On or about June 30, 2015, defendants MARK LEROY DENCKLAU, RYAN ANTHONY NEGRINELLI, and other GJOMC members and associates transported Robert Huggins from Portland, Oregon to Woodland, Washington in a Chevrolet Suburban that belonged to a GJOMC associate, while defendant EARL DEVERLE FISHER and a GJOMC associate traveled in separate vehicles to Woodland, Washington. Defendants MARK LEROY DENCKLAU, RYAN ANTHONY NEGRINELLI, and others met co-defendants █████████ ███████████ and JOSEPH DUANE FOLKERTS at the ARCO Station located off the I-5 exit for Woodland, Washington.

76. On or about June 30 and July 1, 2015, defendants MARK LEROY DENCKLAU, EARL DEVERLE FISHER, RYAN ANTHONY NEGRINELLI, ████████████ JOSEPH DUANE FOLKERTS, and others, on the orders of DENCKLAU, assaulted and tortured Robert Huggins in Woodland, Washington, resulting in the death of Robert Huggins.

77. Between April of 2016 and June of 2018, while incarcerated, defendants MARK LEROY DENCKLAU and EARL DEVERLE FISHER told a GJOMC associate to be nice to a female associate witness in the case, to encourage her not to show up as a witness for trial.

78. Between April of 2016 and June of 2018, while incarcerated, defendant EARL DEVERLE FISHER asked a GJOMC associate if money would prevent the female associate witness from testifying.

79.     In or about 2017 and 2018, a GJOMC member sold, on a front basis, one-half to one pound quantities of methamphetamine from GJOMC property for redistribution.

80.     In or about and between May and June of 2018, defendant MARK LEROY DENCKLAU attempted to recruit an inmate in the Multnomah County Detention Center to become a GJOMC member and explained to the inmate that GJOMC members sell methamphetamine to make money and that some GJOMC members were able to make a living based on their methamphetamine sales.

81.     In or about and between May and June of 2018, defendant MARK LEROY DENCKLAU offered an inmate monetary consideration as payment for the inmate to kill an incarcerated GJOMC associate. DENCKLAU suggested that they make two knives for the inmate to use in order to stage the killing to look like self-defense.

82.     On or about July 11, 2018, while incarcerated, defendant EARL DEVERLE FISHER possessed hand-written correspondence between himself and fellow inmate defendant MARK LEROY DENCKLAU. In these notes, defendants FISHER and DENCKLAU discussed the 2014 beating of Robert Huggins, the taking of his property, and his subsequent murder.

83.     On or about July 1, 2015, defendant MARK LEROY DENCKLAU wrote to defendant EARL DEVERLE FISHER, "if we're both hoping to be in a situation where we can testify in front of the jury, our testimony needs to be similar." In the letters, DENCKLAU cautioned FISHER to make sure the letters were, "destroyed and gotten rid of. The last thing we need is something like that coming back to haunt us."

84.     On or about July 19, 2018, a GJOMC member sold distribution quantities of methamphetamine from the GJOMC clubhouse in Spokane Valley, Washington.

85. On or about October 12, 2018, a GJOMC member sold distribution quantities of methamphetamine from GJOMC/RBMC property in Kennewick, Washington.

86. On or about October 17, 2018, a GJOMC member sold distribution quantities of methamphetamine from the GJOMC clubhouse in Spokane Valley, Washington.

87. On or about October 18, 2018, a GJOMC member sold distribution quantities of methamphetamine and heroin from GJOMC/RBMC property in Kennewick, Washington.

88. On or about October 26, 2018, at the GJOMC/RBMC property in Kennewick, Washington, a GJOMC member possessed methamphetamine, heroin and $2,600 in cash, which included bills used to purchase methamphetamine from the GJOMC member earlier that week, along with a GJOMC cut, silver GJOMC rings, GJOMC branded clothing, GJOMC belt buckles, and notes pertaining to the operations of the GJOMC.

## Notice of Acts with Enhanced Sentencing

89. Between on or about June 30, 2015, through on or about July 1, 2015, in the District of Oregon and the Western District of Washington, defendants MARK LEROY DENCKLAU, EARL DEVERLE FISHER, and RYAN ANTHONY NEGRINELLI, did murder Robert Huggins, that is, acting with one or more persons, MARK LEROY DENCKLAU, EARL DEVERLE FISHER, and RYAN ANTHONY NEGRINELLI, committed and attempted to commit the crime of kidnapping, in violation of Oregon Revised Statutes, Sections 163.225 and 163.235, and in the course of and in furtherance of the crime of kidnapping MARK LEROY DENCKLAU, EARL DEVERLE FISHER, and RYAN ANTHONY NEGRINELLI were committing and attempting to commit MARK LEROY DENCKLAU, EARL DEVERLE FISHER, and RYAN ANTHONY NEGRINELLI and other participants caused the death of Robert Huggins, in violation of Oregon Revised Statutes, Sections 163.115(1)(b) and 161.155;

and, under circumstances manifesting an extreme indifference to human life, MARK LEROY

DENCKLAU, EARL DEVERLE FISHER, RYAN ANTHONY NEGRINELLI, █████████

████████ and JOSEPH DUANE FOLKERTS engaged in conduct which created a grave risk

of death to Robert Huggins, and thereby caused the death of Robert Huggins, in violation of

Washington Revised Statutes, Sections 9A.32.030(1)(b) and 9A.08.020; and MARK LEROY

DENCKLAU, EARL DEVERLE FISHER, RYAN ANTHONY NEGRINELLI, █████████

████████ JOSEPH DUANE FOLKERTS and other participants committed and attempted to

commit the crime of kidnapping in the first and second degree, and in the course of and in

furtherance of such crime of kidnapping, MARK LEROY DENCKLAU, EARL DEVERLE

FISHER, RYAN ANTHONY NEGRINELLI, █████████████████ JOSEPH DUANE

FOLKERTS and other participants caused the death of Robert Huggins, in violation of

Washington Revised Statutes, Sections 9A.32.030(1)(c) and 9A.08.020;

All in violation of Title 18, United States Code, Section 1962(d).

## COUNT 2
### (Murder in Aid of Racketeering)
### (18 U.S.C. § 1959(a)(1) and 18 U.S.C. § 2)

90.     Paragraphs One through Thirteen of this indictment are re-alleged and

incorporated by reference as though fully set forth herein.

91.     At all times relevant to this superseding Indictment, the above-described

enterprise, the GJOMC, through its members and associates, engaged in racketeering activity as

defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), namely acts involving

Murder, in violation of Oregon Revised Statutes, Sections 161.450, 161.155, 161.405, and

163.115, and Revised Code of Washington, Sections 9A.28.040 9A.08.020, 9A.28.020, and

9A.32.030; Kidnapping, in violation of Oregon Revised Statutes, Sections 161.450, 161.155,

161.405, 163.235, and 163.225; and Revised Code of Washington, Sections 9A.28.040, 9A.08.020, 9A.28.020, 9A.40.020, and 9A.40.030; Robbery, in violation of Oregon Revised Statutes, Sections 161.450, 161.155, 161.405, 164.415, and 164.405; and Revised Code of Washington, Sections 9A.28.040, 9A.08.020, 9A.56.200, and 9A.56.210; and Extortion, in violation of Oregon Revised Statutes, Sections 161.450, 161.155, 161.405, and 164.075; offenses involving drug trafficking in violation of Title 21, United States, Code Sections 841 and 846; and acts indictable under Title 18, United States Code, Section 1512 (relating to tampering with a witness, victim, or informant).

92.     On or between June 30 and July 1, 2015, in the District of Oregon, and Western District of Washington, for the purpose of maintaining and increasing position in the GJOMC, an enterprise engaged in racketeering activity, the defendants, MARK LEROY DENCKLAU, EARL DEVERLE FISHER, RYAN ANTHONY NEGRINELLI, ███████████████ and JOSEPH DUANE FOLKERTS, and others known and unknown to the grand jury, aiding and abetting each other, unlawfully and knowingly committed, and aided and abetted the commission of, the murder of Robert Huggins, in violation of Oregon Revised Statutes 161.155 (aid and abet),  163.115(1)(a) (Murder) and 163.115(1)(b) (Felony Murder); and Washington Revised Statutes 9A.08.020 (Liability for conduct of another—Complicity), and 9A.32.030 (Murder in first degree/Felony Murder);

All in violation of Title 18, United States Code, Sections 1959(a)(1) and 2.

//

//

//

//

## COUNT 3
### (Kidnapping in Aid of Racketeering, Resulting in Death)
### (18 U.S.C. § 1959(a)(1) and 18 U.S.C. § 2)

93.     Paragraphs One through Thirteen and paragraph Ninety-one of this indictment are re-alleged and incorporated by reference as though fully set forth herein.

94.     On or between June 30 and July 1, 2015, in the District of Oregon, and Western District of Washington, for the purpose of maintaining and increasing position in the GJOMC, an enterprise engaged in racketeering activity, the defendants, MARK LEROY DENCKLAU, EARL DEVERLE FISHER, RYAN ANTHONY NEGRINELLI, ███████████████ and JOSEPH DUANE FOLKERTS, and others known and unknown to the grand jury, aiding and abetting each other, unlawfully and knowingly kidnapped Robert Huggins, in violation of United States Code Sections 1201(a)(1) and 2;

All in violation of 18 U.S.C. Sections 1959(a)(1) and 2.

## COUNT 4
### (Kidnapping Resulting in Death)
### (18 U.S.C. §§ 1201(a)(1) and 2))

95.     On or between June 30 and July 1, 2015, in the District of Oregon, and Western District of Washington, the defendants, MARK LEROY DENCKLAU, EARL DEVERLE FISHER, RYAN ANTHONY NEGRINELLI, ████████████████████ and JOSEPH DUANE FOLKERTS, and others known and to the grand jury, did unlawfully and willfully seize, confine, kidnap, inveigle, decoy, abduct and carry away Robert Huggins for the benefit of the defendants, and, in committing and in furtherance of the commission of the offense, did willfully transport Robert Huggins in interstate commerce from Portland, Oregon to Woodland, Washington, and traveled in interstate commerce from Portland, Oregon to Woodland,

Washington, and used a telephone, a means, facility, and instrumentality of interstate or foreign commerce, which conduct resulted in the death of Robert Huggins;

All in violation of Title 18, United States Code, Sections 1201(a)(1) and 2.

## COUNT 5
### (Conspiracy to Commit Kidnapping, Resulting in Death)
### (18 U.S.C. §§ 1201(a)(1) and 1201(c))

96.     On or between June 5 and July 1, 2015, in the District of Oregon, and Western District of Washington, defendants MARK LEROY DENCKLAU, EARL DEVERLE FISHER, RYAN ANTHONY NEGRINELLI, ███████████████ and JOSEPH DUANE FOLKERTS, and others known and unknown to the grand jury, did knowingly combine, conspire, confederate, and agree to seize, confine, kidnap, inveigle, decoy, abduct and carry away Robert Huggins for the benefit of the defendants, and used a telephone, a means, facility, and instrumentality of interstate or foreign commerce in furtherance of this offense, which conduct resulted in the death of Robert Huggins;

All in violation of Title 18, United States Code, Sections 1201(a)(1) and 1201(c).

//

//

//

//

//

//

//

//

//

## NOTICE OF SPECIAL FINDINGS
### (18 U.S.C. §§ 3591 and 3592)

1.     The Grand Jury incorporates by reference and re-alleges the allegations contained in Counts Two and Four of this Indictment and makes the following special findings as to Count Two and Four, the defendants:

MARK LEROY DENCKLAU,
EARL DEVERLE FISHER,
RYAN ANTHONY NEGRINELLI,
███████████████
and

JOSEPH DUANE FOLKERTS,

a.     Were 18 years of age or older at the time of the offenses. [Title 18, United States Code, Section 3591(a)];

b.     Intentionally killed the victim, Robert Huggins. [Title 18, United States Code, Section 3591(a)(2)(A)];

c.     Intentionally inflicted serious bodily injury that resulted in the death of the victim, Robert Huggins. [Title 18, United States Code, Section 3591(a)(2)(B)];

d.     Intentionally participated in an act, contemplating that the life of a person would be taken and intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim, Robert Huggins, died as a direct result of the acts. [Title 18, United States Code, Section 3591(a)(2)(C)]; and

e.     Intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim, Robert Huggins, died as a direct result of the act. [Title 18, United States Code, Section 3591(a)(2)(D)].

# FORFEITURE ALLEGATION
## (Racketeering Conspiracy)

Upon conviction of an offense in violation of Title 18, United States Code, Section 1962, as charged in Count 1 of this Superseding Indictment, defendants MARK LEROY DENCKLAU, EARL DEVERLE FISHER, KENNETH EARL HAUSE, RYAN ANTHONY NEGRINELLI, ███████████████ and JOSEPH DUANE FOLKERTS, pursuant to Title 18, United States Code, Section 1963, shall forfeit to the United States of America:

    a.     any interest acquired or maintained in violation of section 1962;

    b.     any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendants established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962; and

    c.     any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of 1962,

including, but not limited to a Money Judgment in amount to be determined to be the aggregate value of the property described in a through c above. If any of the property described above, as a result of any act or omission of the defendants:

    a.     cannot be located upon the exercise of due diligence;

    b.     has been transferred or sold to, or deposited with, a third party;

    c.     has been placed beyond the jurisdiction of the court;

    d.     has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without

difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

18, United States Code, Section 1963(m).

Dated: November 29th, 2018.

A TRUE BILL.

OFFICIATING FOREPERSON

Presented by:

BILLY J. WILLIAMS
United States Attorney

LEAH K. BOLSTAD, OSB #052039
Assistant United States Attorney

DAVID L. JAFFE
Chief, Organized Crime and Gang Section

REBECCA A. STATON, INB #22861-49
Trial Attorney